IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AMERICAN FAMILY LIFE INSURANCE COMPANY OF COLUMBUS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ASSURANT, INC., FORTIS INSURANCE COMPANY, and JOHN ALDEN LIFE INSURANCE COMPANY,<br><br>　　　　Defendants. | CIVIL ACTION FILE<br><br>NO. 1:05-CV-1462-BBM |

## **O R D E R**

This matter is before the court on the Motion for Preliminary Injunction [Doc. No. 68] and Notice of Objections to Certain Declarations Submitted by Defendants ("Notice of Objections") [Doc. No. 119] filed by plaintiff American Family Life Insurance Company of Columbus ("AFLAC") against defendants Assurant, Inc. ("Assurant"), Fortis Insurance Company ("Fortis"), and John Alden Life Insurance Company ("John Alden") (collectively, the "Defendants").[1] The court held a hearing with respect to these motions on December 22, 2005 (the "December 22 hearing"). At that time, the court advised the parties it would enter a written Order upon closer

---

[1]John Alden and Fortis are wholly owned subsidiaries of Assurant; both do business under the name Assurant Health. (Opp'n to Pl.'s Mot. for Prelim. Inj. 3.)

consideration of applicable authority as well as the insurance policies at issue. The court now provides the parties with the written Order it promised at the December 22 hearing.

## I.    Factual and Procedural Background[2]

### A.    Creation of AFLAC's policies

The present case centers on four insurance policies offered by AFLAC as part of its supplemental insurance business: Cancer Indemnity Insurance ("Cancer Policy"), Accident-Only Policy ("Accident Policy"), Hospital Confinement Indemnity Policy ("Hospital Policy"), and Hospital Confinement Sickness Indemnity ("Sickness Policy"). Unlike traditional insurance policies, supplemental insurance policies are risk specific. It is undisputed that AFLAC is a market leader with respect to supplemental insurance.

According to AFLAC, the four policies at issue were developed at different times from 1997 to 2003, each requiring several months of work.[3] Specifically,

---

[2]Because the court assumes familiarity with the factual background based on the December 22 hearing, it will engage in only a brief discussion of the factual and procedural background of this case.

[3]According to AFLAC, new or revised policies would first be considered upon recommendation from the company's Marketing Department. In response, a Product Development Group ("PDG") comprised of representatives from the five departments listed infra, would be formed. If the PDG agreed with the Marketing Department's assessment, the group would conduct its own analysis to determine what should be included in the new policies.

AFLAC states that creation of its Cancer Policy took eight months approximately, with drafting comprising five; creation of its Accident Policy took nine months approximately, with drafting comprising six; creation of its Hospital Policy took nine months approximately, with drafting comprising three; and creation of its Sickness Policy took nine months approximately, with drafting comprising four. All drafting and revisions took place under the direction of Deborah Grantham ("Grantham"), Second Vice President of AFLAC's compliance department. Ms. Grantham testified at the December 22 hearing, and the court found her testimony to be quite credible. She summarized the efforts undertaken by AFLAC in drafting the new policies, including weekly meetings of the PDG to review and revise drafts.

According to AFLAC, "[o]ther than certain medical definitions provided by consulting medical professionals or medical publications, Ms. Grantham did not review any document from any third party and did not copy provisions from competitors' policies."[4] (Pl.'s Mot. for Prelim. Inj. 6; see also Grantham Decl. ¶ 12.) The department did, however, review the then-current policy for the particular type

_____

[4]Defendants dispute this assertion, arguing that "portions of AFLAC's policy contracts are unoriginal because they were copied by AFLAC from third-party works, including competitors' policies and medical dictionaries." (Opp'n to Pl.'s Mot. for Prelim. Inj. 20 (emphasis omitted).) Specifically, defendants cite three definitions discovered "so far" which they claim were taken from "various medical dictionaries," the Cancer.gov website, and an American Heritage Life Insurance Policy respectively. (Id. 20-21.)

of coverage at issue.[5]   Because AFLAC had not previously offered a Sickness Policy, the department reviewed the then-current policy Hospital Policy instead.   (Pl.'s Mot. for Prelim Inj. 5-6; Grantham Decl. ¶ 10.)

With respect to the drafting process itself, AFLAC explains that numerous factors had to be considered[6] by those individuals involved, which included representatives from the company's actuarial, claims, marketing, compliance, and underwriting departments.   Indeed, before drafting could commence, AFLAC had to decide which new conditions and treatments to cover; which new benefits to provide and on what terms; which existing benefits, if any, to change; which definitions and/or other provisions to add or change; and which order was best.   Moreover, once the process was underway, each draft was reviewed and revised "repeat[edly]."   (Pl.'s Mot. for Prelim. Inj. 6.)   Factors considered included "whether the proposed language appropriately described the specific benefits to be provided . . . ; whether the overall

---

[5]AFLAC asserts that it owns copyrights for these "immediately-preceding" versions as well.   (Pl.'s Mot. for Prelim. Inj. 5; see also Whitaker Decl., Exs. 9-11 (copyright registration certificates for AFLAC's Cancer, Accident, and Hospital Policies, completed in 1997, 1997, and 1995 respectively).)   According to AFLAC, it first began offering cancer policies in the 1950s, hospital policies in 1990, and accident policies in 1988.   Although "some" prior accident policies and "many" early cancer policies have not been copyrighted, AFLAC maintains that they have changed "substantially" over time.   (Pl.'s Mot. for Prelim. Inj. 5 n.4.; see also Grantham Decl. ¶¶ 17, 22, 27.)

[6]Factors considered include what new medical diseases or conditions had arisen; what developments had taken place with respect to medical treatment; and what developments had occurred in the marketplace (e.g., changes in competitor offerings).

language was consistent with the actuarial department's understanding of the anticipated coverage; what effect the new policy language would have on claims; whether claims administrators had clear guidelines for making benefit determinations; [and] whether the benefits and other provisions would be easily explainable to potential policyholders . . . ." (Id.) Finally, AFLAC spent some time ensuring its "narrative" language style – as compared to the "terse, nondescriptive" style employed by some of its competitors – would be "readily understood by consumers."[7] (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 4.)

B.     Creation of Defendants' Policies

---

[7]AFLAC relies on "simple, lay terms" to describe its policy provisions. (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 4.) For example, in its Sickness Policy, AFLAC defines "Ambulatory Surgical Center" as follows:

> a facility, licensed as such, that provides surgical services on an outpatient basis. This does not include a doctor's or dentist's office, clinic or other such location.

(Id. 5; see also Compl., Ex. D.) By contrast, in its Sickness Hospital Income Policy, Combined Insurance Company of America defines "Ambulatory Surgical Center" as:

> a public or private institution which complies with each of the following: (1) employs a medical staff of Physicians; (2) consists of permanent facilities equipped and operated primarily for performing surgical procedures; (3) offers continuous Physician and registered nursing services when a patient is in the facility; (4) does not provide services or accommodations for patients to stay overnight; and (5) operates pursuant to law.

(Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 5; Second Whitaker Decl., Ex. 4-DD.)

Defendants traditionally have been known for their major medical insurance offerings. Nonetheless, looking to compete directly with AFLAC, defendants hired Mark Shaw ("Shaw"), a former Senior Vice President and Risk Manager at AFLAC,[8] to develop their own line of supplemental insurance policies under the name "VoluntaryMart." Defendants had made a previous, unsuccessful attempt in July 2002 to enter this market with a line of policies developed under the name "BenefitMart."

Defendants' efforts with respect to VoluntaryMart had begun approximately one year prior in December 2003 when they hired the law firm Katz, Teller, Brandt & Hild ("Katz Teller") to generate draft policies.[9] Moreover, defendants specifically requested that Stephen Kisling ("Kisling"), a partner at the firm, be assigned to the project given his experience drafting policies for defendants previously. To assist Katz Teller, David Hill ("Hill"), an in-house attorney with Fortis, forwarded the firm

---

[8]While at AFLAC, Shaw was responsible for "review[ing] and comment[ing] on product pricing, designs, underwriting, and actual policy language." (Pl.'s Mot. for Prelim. Inj. 14.)

[9]According to defendants, Katz Teller was hired shortly after Ann Mayberry-French ("French"), former General Counsel of Fortis, advised Shaw that "as a matter of general business practice" defendants "should not simply copy word-for-word a competitor's policy." (French Decl. ¶ 3.) French did so after learning of Shaw's belief that defendants "could use virtually word-for-word AFLAC's insurance policies in order to compete with AFLAC." (Id. ¶ 2.)

"samples" of other supplemental insurance policies, including AFLAC's.[10]  Although

work on the policies began in December 2003, all four were completed by April 2004.

Specifically, an initial version of the Cancer Policy was created on or about January

6, 2004 and subsequently filed with Ohio on or about March 5, 2004;[11] an initial

version of the Accident Policy was created on or about January 11, 2004 and

subsequently filed with Ohio on or about March 5, 2004;  an initial version of the

Hospital Policy was created on or about January 9, 2004 and subsequently filed with

Ohio on or about April 9, 2004; and an initial version of the Sickness Policy was

created on or about January 11, 2004 and subsequently filed with Ohio on or about

April 9, 2004.[12]  (Kisling Dep., Ex. 101.)

---

[10]AFLAC disputes this assertion, noting that none of defendants' witnesses "have been able to identify a single company whose policies were sent other than AFLAC." (Pl.'s Mot. for Prelim. Inj. 9 n.6.)  To this end, AFLAC cites a memo drafted by Kisling on or about December 19, 2003 in which he states that defendants will be "sending sample documents used by Aflac" only to assist him in "drafting the certificates of insurance/coverage that will be filed in each of the states in which the products will be offered."  (Kisling Dep., Ex. 13, Sept. 2, 2005.)

[11]Evidence in the record indicates that the initial version of Katz Teller's Cancer Policy, saved in the Katz Teller computer system under the internal word processing number "KTBH: 580980.1," was a verbatim copy of AFLAC's.  Remarkably, the document turned over by Katz Teller corresponding to this number included AFLAC's name and address on its cover page and a listing of AFLAC's officers in its index.

[12]Defendants maintain that "hundreds of hours were spent by the project team and Katz Teller in the drafting process" for which they were paid over $540,000.  (Opp'n to Pl.'s Mot. for Prelim. Inj. 6.)  Still, during his deposition, Kisling stated that he had no recollection of drafting either the definitions or benefits sections in any of the policies "from scratch."  (Kisling Dep. 135:9-136:19.)

Also involved in the development of defendants' supplemental insurance policies was Karl Vokmar ("Volkmar"), an actuarial consultant. Defendants hired Vokmar in September 2003 to develop pricing and other required actuarial information. Following their first meeting on or about September 10, 2003, Shaw sent Volkmar samples of AFLAC policies for his use. (Volkmar Dep. 175:12-21, Sept. 26, 2005.) Although drafting of defendants' policies had yet to begin, Volkmar nonetheless commenced work, basing his initial actuarial calculations for defendants' policies on AFLAC's rate structure and experiences.[13] Also during this time period,[14] Volkmar drafted the actuarial memoranda that would accompany the policies; these memoranda identified the benefits provided, explained the rates and pricing of a policy, and explained the relationship between the premiums charged and historical or anticipated claims paid. On the drafting process itself, Volkmar states that at least with respect to defendants' Cancer, Accident, and Sickness Policies, he used AFLAC's respective versions "as a starting point." Specifically, Volkmar explains he had his administrative assistant input AFLAC's actuarial memo into a computer system but

---

[13]Volkmar agreed that he would have been more likely to "start from scratch without any competitor information . . . if all the benefits were very different." (Volkmar Dep. 49:19-50:5.)

[14]According to Volkmar, he completed his first actuarial memo in mid-October 2003. (Volkmar Dep. 174:4-16.) As previously noted, Katz Teller was not hired to draft the defendants' policies until December 2003.

for those pages with a red "X" on them; thereafter, he handled the "details" himself.

(Id. 87:10-92:25, 161:5-164:14.)  Volkmar did so based on his belief that defendants

wanted the majority of their benefits to be "identical" or "very similar" to those

offered by AFLAC.  (Id. 161:5-164:14.)  Subsequently, in February 2004, Volkmar e-

mailed Shaw asking him whether "you or your company have any concerns about

our use of AFLAC's rider rates."  In a later e-mail, Volkmar clarified that:

> I knew you didn't have a problem with rate adequacy given that we
> were duplicating (or nearly so) AFLAC's benefit and rates and given
> that we know what their experience has been.  My question was actually
> intended to touch on a possible copyright, etc, issue, which is what I
> thought your legal area had a concern with when they didn't want to
> copy AFLAC's forms word-for-word.  Did I misinterpret something?

(Volkmar Dep., Ex. 218.)  In response, Shaw wrote, "They seem to have largely gotten

over this.  Our forms will borrow heavily, but are not word-for-word AFLAC's."[15]

(Id.)

Currently, defendants are selling their policies in eight "test" states.  As of

August 29, 2005, defendants sold 1,218 policies and collected premiums totaling

$57,730.10.  (Whitaker Decl., Ex. 30.)  As of October 2005, defendants' sales had

almost quadrupled to $225,000 approximately.  (Opp'n to Pl.'s Mot. for Prelim. Inj.

---

[15]According to defendants, Shaw's e-mail simply reflects "his understanding that the documents, which were then in the process of being drafted by Katz Teller, would not be problematic because they were being drafted by outside counsel and, therefore, would not be 'word for word' identical to AFLAC's."  (Opp'n to Pl.'s Mot. for Prelim. Inj. 8.)

32.)

C.     Procedural History

AFLAC filed their Complaint in this court on or about June 3, 2005.  Therein,

AFLAC asserts four counts of copyright infringement with respect to its Cancer,

Accident, Sickness, and Hospital policies respectively.  Thereafter, on or about

October 31, 2005, AFLAC filed their present motion for a preliminary injunction

pursuant to section 502(a) of the Copyright Act.  See 15 U.S.C. § 502(a).  In both their

Complaint and Motion for Preliminary Injunction, AFLAC argues in relevant part

that defendants "produced . . . policies that are substantially similar . . . and in large

part identical to AFLAC's," particularly with respect to their benefits offerings.  (Pl.'s

Mot. for Prelim. Inj. 2; see also Compl. ¶¶ 19, 32, 45, 58.)  In response, defendants

argue that copyright law does not protect AFLAC's asserted interest in "standard

medical definitions and procedures."  (Opp'n to Pl.'s Mot. for Prelim. Inj. 2.)

Defendants further assert that because AFLAC has failed to carry its burden as to

each of the four prerequisites necessary, its motion for a preliminary injunction

should be denied.

## II.    Legal Standard

Under the Copyright Act, this court has authority to grant injunctive relief

"on such terms as it may deem reasonable to prevent or restrain infringement of a

copyright." 17 U.S.C. § 502(a) (2005). Because, however, a preliminary injunction is considered an "'extraordinary and drastic remedy,'" it is not to be granted unless plaintiff successfully carries his burden of persuasion as to each of the four prerequisites. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (citation omitted); see also U.S. v. Jefferson County, 720 F.2d 1511, 1519 (11th Cir. 1983) (acknowledging plaintiff's failure to carry this burden as to any one element will cause motion to be denied). Specifically, plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the so-called "balancing of the equities" tips in his favor, such that the threatened injury to plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest. See Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002); Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001).

## III. Analysis

### A. Nondispositive Motions

AFLAC argues first that the court should exclude various declarations submitted by defendants purporting to establish both that the "balancing of equities" tips in defendants' favor and an injunction will disserve the public interest insofar as it prevents competition with respect to the supplemental insurance market.

Specifically, AFLAC objects to the Declaration of Julie Hix ("Hix") in its entirety "because she lacks personal knowledge to support any of the alleged facts contained therein"; the Declarations of Dr. William S. Custer ("Custer") in their entirety because his opinions are "speculative, unreliable, and do not otherwise satisfy the standards of admissibility for expert testimony under Federal Rule of Evidence 702 and related case law"; and the Declaration of William Kezele ("Kezele") in its entirety because "he refused to answer certain questions at deposition based on an asserted attorney/client privilege with Defendants' counsel even though . . . no attorney/client relationship existed between him and Defendants' counsel during the time frame addressed by the questions." (Notice of Objections 2.) AFLAC also objects to paragraph six of the Declaration of Diedre Weber ("Weber") "because she lacks personal knowledge of the alleged facts contained therein" and paragraph 10 of the Declaration of Pamela Mallari ("Mallari") "because she has no personal knowledge and cites no factual basis for her claim that AFLAC was 'forced to disclaim' anything in its copyright applications." (Id. 2-3.) For their part, defendants claim AFLAC's Notice of Objections is without merit. Because the court finds its ruling would not be changed by consideration of the Hix, Custer, Kezele, Weber, and Mallari Declarations

respectively, AFLAC's Notice of Objections is DENIED.[16]

B.      Motion for Preliminary Injunction

        1.      Substantial Likelihood of Success on the Merits

To establish a <u>prima facie</u> case of copyright infringement, AFLAC must show both that (1) it owns a valid copyright in the insurance polices at issue and (2) that defendants copied original elements of said policies while creating their own.  <u>See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991); <u>MiTek Holdings, Inc. v. Arce Eng'g Co.</u>, 89 F.3d 1548, 1553 (11th Cir. 1996).

        a.      Valid Copyright

The plaintiff in a copyright infringement action bears the burden of proving ownership of a valid copyright.  <u>See Montgomery v. Noga</u>, 168 F.3d 1282, 1289 (11th Cir. 1999).  Under the Copyright Act, "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c) (2005).  Additionally, "[t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the

---

[16]The court notes that currently pending is AFLAC's Motion for Sanctions Regarding Defendants' Filing the Declaration of Julie Hix [Doc. No. 132].  The court's ruling as to AFLAC's Notice of Objections does not address the merits of AFLAC's motion. The court affirmatively reserves its ruling on the issues raised by AFLAC in that motion.

discretion of the court." Id.  Here, AFLAC owns certificates of registration for each of the four policies at issue.[17]  (Whitaker Decl., Exs. 2, 4, 6, 8.)  Because certificates of registration were made within five years after "first publication" of AFLAC's Cancer, Accident, and Sickness Policies, plaintiff benefits from a rebuttable presumption that these copyrights are valid.  Although a certificate of registration for AFLAC's Hospital Policy was not made before or within five years after "first publication," defendants have presented no argument – and the court can articulate none – as to why plaintiff should not also benefit from a similar presumption with respect to this copyright.  As such, the burden shifts to the defendants who are "required to demonstrate that 'the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that . . . the copyrighted work actually taken is unworthy of copyright protection.'"  Montgomery, 168 F.3d at 1289 (quoting Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1541 (11th Cir. 1996)); see also MiTek, 89

_____

[17]According to AFLAC, the company obtained copyright registrations "without any opposition from the Copyright Office."  (Bernstein Decl. ¶ 4.)  Soon thereafter, however, Jason Bernstein ("Bernstein"), the  Powell Goldstein lawyer  "primarily responsible for obtaining the copyright registrations at issue in this case," realized that the "firm had erred in failing to describe the policies at issue as derivative works."  (Id. ¶¶ 2, 4.)  As such, he filed the requisite forms to correct the registrations; "[s]ome of these" have since been issued and "some we expect to be issued in the future."  (Id. ¶ 4 & Exs. A-D.)  Under the Copyright Act, a derivative work is one "consisting of editorial revisions, annotations, elaborations, or other modifications [to a preexisting work that], as a whole, represent[s] an original work of authorship . . . ."  17 U.S.C. § 101 (2005).

F.3d at 1554 ("Once the plaintiff produces a certificate of copyright, the burden shifts to the defendant to demonstrate why the claim of copyright is invalid.") (internal quotations and citation omitted). Defendants argue in relevant part that AFLAC has failed to identify any original expression worthy of copyright protection. The court disagrees.

Preliminarily, the court addresses defendants' assertion that AFLAC has failed to identify in the first instance "the elements of its work that it considers to be protectable." (Opp'n to Pl.'s Mot. for Prelim. Inj. 15.) In both its Supplemental Response to Defendants' First Set of Interrogatories as well as its Reply Brief, AFLAC plainly states that it considers the entire benefits section of each policy as well as some definitions, limitations, and exclusions to be original. (See Opp'n to Pl.'s Mot. for Prelim. Inj., Ex. 9 (Pl.'s Supplemental Resp. to Defs.' First Set of Interrogs. 6-7); Pl.'s Reply in Supp. of Mot. for Prelim Inj. 7 n.3; see also Second Whitaker Decl. ¶ 5 & Ex. 2.) Accordingly, the court will look to those portions of the policies for purposes of its analysis.

Defendants initially assert that AFLAC's claims of originality are based on nothing more than "(1) making discretionary decisions about what benefits to offer; (2) balancing risks, benefits and premiums and (3) the time spent by many people in making those discretionary decisions," none of which "create[] a copyrightable

interest." (Opp'n to Pl.'s Mot. for Prelim. Inj. 16-17.) To be sure, AFLAC has

emphasized that it made "many subjective and discretionary choices in the

drafting."[18] (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 4; see also Pl.'s Mot. for

Prelim. Inj. 27 ("For each policy, AFLAC determined which treatments and conditions

to cover, what new benefits to provide and on what terms, what existing benefits if

---

[18]With respect to AFLAC's discretionary decisions, defendants cite BellSouth Adver.
& Publ'g Corp. v. Donnelley Info. Publ'g, Inc., 999 F.2d 1436, 1441 (11th Cir. 1993) and
Warren Publ'g, Inc. v. Microdos Data Corp., 115 F.3d 1509, 1519 (11th Cir. 1997) for the
proposition that "the Copyright Act does not protect 'industrious collections,' nor does
it 'afford shelter to the resourceful, efficient or creative collector.'" (Opp'n to Pl.'s Mot. for
Prelim. Inj. 17 (citation omitted).) Specifically, defendants assert AFLAC's collection of
"accepted medical definitions and lists of medical procedures and treatments" does not
warrant copyright protection. (Id.) Initially, the court disagrees with defendants'
characterization of AFLAC's policies as "industrious collections." Unlike purely factual
compilations, addressed in both BellSouth and Warren Publ'g, Inc., the record plainly
demonstrates AFLAC spent some time ensuring its policies – and particularly its benefits
section – reflected the narrative language style it favored such that they would be readily
understood. Wordsmithing of this sort was simply not at issue in either BellSouth, which
centered on the copyright protected afforded a "yellow pages" classified business
directory where each subscriber was listed in alphabetical order under an appropriate
heading, or Warren Publ'g, Inc., which centered on the copyright protection afforded a
directory of cable television systems where plaintiff organized and presented 1,340 pages
of factual data. Moreover, even where factual compilations are at issue, a copyright owner
may claim infringement "when one copies the protected selection, coordination, or
arrangement" therein. Warren Publ'g, Inc., 115 F.3d at 1515; see also BellSouth, 999 F.2d
at 1440. Here, although it need not, AFLAC has done so, alleging defendants copied its
"purposeful arrangement and selection" of policy provisions. (See Pl.'s Reply in Supp.
of Mot. for Prelim. Inj. 6.) Finally, the court notes defendants themselves subsequently
classify AFLAC's policies as derivative works (see Opp'n to Pl.'s Mot. for Prelim. Inj. 18
("**each** of AFLAC's contracts are 'Derivative Works'")), arguably rendering this line of
argument irrelevant. See Warren Publ'g, Inc., 115 F.3d at 1515 n.16 (distinguishing
between the protection afforded creative works, derivative works, and compilations
respectively under copyright law).

any, should be changed, how the benefits should be ordered in the policy, and what limitations, exclusions, and definitions should be added or changed, if any.").) AFLAC has also emphasized, however, that it both "created the specific policy language that describes the coverage provided," (Pl.'s Mot. for Prelim. Inj. 27), and made "discretionary" decisions with respect to the type of language used (i.e., narrative as opposed to "terse" and "nondescriptive"). (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 4.) Such "editorial revisions, annotations, elaborations, or other modifications" to a preexisting work plainly creates a copyrightable interest protected by law. See 17 U.S.C. §§ 101, 103; see also Montgomery, 168 F.3d at 1290 (noting that derivative works "if . . . non-infringing and sufficiently original-qualif[y] for a separate copyright"). Morever, even if AFLAC were simply relying on the "discretionary decisions" it made "about what benefits to offer" for purposes of its infringement claim – and the court finds it is not – as discussed in footnote 18 supra, such is also protected by law. See Warren Publ'g, Inc., 115 F.3d at 1515 (noting when one "copies the protected selection, coordination, or arrangement in a factual compilation" he has infringed the compilation copyright). The court thus finds defendants' argument that AFLAC has failed to identify a copyrightable interest without merit.

Defendants argue next that changes made to AFLAC's Cancer, Accident,

Hospital, and Sickness Policies are not sufficiently original to support valid copyrights as derivative works. As has been noted repeatedly in caselaw, the "*sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author." Feist, 499 U.S. at 345; see also MiTek, 89 F.3d at 1554; BellSouth, 999 F.2d at 1440. Notably, the threshold for protection is not high. Indeed, all that must be shown is that the work possess "some minimal degree of creativity . . . even a slight amount will suffice." Feist, 499 U.S. at 345. The court finds that here, this admittedly "low" threshold has been met. Montgomery, 168 F.3d at 1290. Specifically, even a cursory examination of the policies at issue reveal additions and revisions not present previously,[19] all of which have been drafted in accordance with AFLAC's "narrative" language style. For example, out of thirteen definitions in AFLAC's current Cancer Policy, five had not been present previously and out of twenty eight benefits, four had not been present previously. (Mallari Decl., Ex. 1-B.) Virtually all the remaining definitions and benefits have been revised, some extensively.[20] (Id.) Finally, AFLAC added an "Eligibility for Benefits" section that

---

[19]The court notes that the policies it is relying on for present purposes were approved at varying points in time subsequent to March 1, 1989. (See Mallari Decl., Ex. 1-A to -D (compiling provisions).)

[20]By way of example, in a prior version of AFLAC's Cancer Policy, published on or about February 10, 1995, the following "Outpatient Blood and Plasma Benefit" is offered:

had not been present previously.  (Id.)  Similar additions and revisions were made to

AFLAC's Accident, Hospital, and Sickness Policies as well.   (Id. Ex. 1-A, -C-D.)  In

light of the above, the court finds defendants have failed to meet their burden of

showing the changes AFLAC made to its Cancer, Accident, Hospital, and Sickness

Policies were not sufficiently original to support a valid copyright in each as

derivative works.  See Montgomery, 168 F.3d at 1290-91 (concluding "additions and

corrections" made to a computer program were sufficiently original to support a

valid copyright in such as a derivative work).

Defendants argue finally that because AFLAC has claimed infringement in

none of its prior works, "[it] must prove infringement of the original expression . . .

_____

> AFLAC will pay the actual charges incurred for the blood/plasma, blood
> processing, blood administration, crossmatching and transfusion fees up to
> $200 (two hundred dollars) for each day a covered person receives blood
> transfusions for the treatment of cancer as an outpatient in a doctor's office,
> clinic, Hospital or ambulatory surgical center.  No lifetime maximum.

(Mallari Decl., Ex. 1-B.)  This benefit has been revised with respect to the current policy as
follows:

> AFLAC will pay $250 (two hundred fifty dollars) for each day a covered
> person receives blood and/or plasma transfusions for the treatment of
> Cancer as an outpatient in a Physician's office, clinic, Hospital, or
> Ambulatory Surgical Center when a charge is incurred.  This benefit does
> not pay for immunoglobulins, immunotherapy, or colony-stimulating
> factors.  No lifetime maximum.

(Id.)

found in the Derivative Works" as AFLAC's copyright "'does not protect the preexisting material'" employed therein. (Opp'n to Pl.'s Mot. for Prelim. Inj. 18-19 (quoting <u>Montgomery</u>, 168 F.3d at 1290).) AFLAC disputes this assertion, claiming that because its current policies incorporate language from prior versions, "many of which have been registered themselves," AFLAC "is entitled to copyright protection of all the protectible original language in the current policies." (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 8-9.) Defendants disagree, noting "a number of AFLAC's pre-1989 policy contracts lack any copyright notice, yet contain language that is identical or substantially similar to that contained in the asserted contracts." (Opp'n to Pl.'s Mot. for Prelim. Inj. 25 & Ex. 32(a)-(d).) As such, defendants argue that language has been lost to the public domain and cannot serve as the basis for protection. Under the Copyright Act, with respect to copies publicly distributed before March 1, 1989, the omission of a copyright notice does not invalidate an owner's copyright therein if:

> (1) the notice has been omitted from no more than a relatively small number of copies . . . distributed to the public; or

> (2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies . . . that are distributed to the public in the United States after the omission has been discovered; or

> (3) the notice has been omitted in violation of an express requirement in writing that, as a condition of the copyright owner's authorization of the public distribution of copies . . . they bear the prescribed notice.

17 U.S.C. § 405(a)(1)-(3) (1997).  Here, AFLAC does not claim to have satisfied any of the above conditions as to its pre-1989 policies.  Rather, it asserts simply that "many" of its prior policies have been registered and includes registration certificates for its Cancer, Accident, and Hospital Policies completed in 1997, 1997, and 1995 respectively.[21]  (See Whitaker Decl., Exs. 9-11.)  That AFLAC has registration certificates for its post-1989 policies, however, does not directly address defendants' argument that language included in its pre-1989 policies has been forfeited to the public domain.  Nonetheless, even assuming AFLAC forfeited copyright protection in its pre-1989 policies by publishing them without a copyright notice, for those reasons outlined supra, the court finds the changes AFLAC made sufficiently original to support a valid copyright in its current policies as derivative works.[22]  See Montgomery, 168 F.3d at 1289-90 (concluding that regardless of whether previous version of computer program had been lost to public domain, subsequent version of program was sufficiently original to support valid copyright).  Further, also assuming

---

[21]The court notes none of these policies were in fact registered with the Copyright Office until June 2005.  (Whitaker Decl., Exs. 9-11.)

[22]If anything, changes made to AFLAC's current policies from its pre-1989 versions are more dramatic than those cited above.  For example, whereas AFLAC's pre-1989 Accident Policy had seven definitions only, AFLAC's current policy has twenty three.  Similarly, whereas AFLAC's pre-1989 Accident Policy offered three benefits, AFLAC's current policy offers seventeen.  This is to say nothing of revisions made with respect to both language and organization.  The same holds true for each of the other policies at issue.

AFLAC forfeited its copyrights in its pre-1989 policies by publishing them without a copyright notice, the court finds persuasive AFLAC's argument that it is not claiming protection for "mere phrases"; rather, "it is claiming protection for the expression of entire provisions." (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 15.) For reasons discussed more fully in Section III.B.1.b., <u>infra</u>, the court believes that, at least with respect to some of AFLAC's policies, evidence of defendants' copying is remarkable, and goes well beyond whatever language was arguably forfeited to the public domain.

In light of the foregoing, the court finds that defendants have not met their burden of demonstrating that "the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that . . . the copyrighted work actually taken is unworthy of copyright protection." <u>Montgomery</u>, 168 F.3d at 1289 (internal quotations and citation omitted). Accordingly, the court turns its attention to the second element AFLAC must show to prevail – copying of original elements of its Cancer, Accident, Hospital, and Sickness Policies respectively.

b. Copying

Normally, "proof of copying may be shown either by direct evidence, or, in the absence of direct evidence, it may be inferred from indirect evidence demonstrating that the defendant had access to the copyrighted work and that there are probative

similarities between the allegedly infringing work and the copyrighted work." MiTek, 89 F.3d at 1554. However, as recognized by the Eleventh Circuit:

> Where the form of expression is largely prescribed by functional constraints, the similarity of expression in a subsequent work must be very close in order to establish infringement. 'Factual works are different [from works of fiction]. Subsequent authors wishing to express the ideas contained in a factual work often can choose from only a narrow range of expression. . . . Therefore, similarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed.'

BellSouth, 999 F.2d at 1444 n.18 (quoting Landsberg v. Scrabble Crossword Game Players, Inc., 736 F.2d 485, 488 (9th Cir. 1984)). Although the above statement was made with respect to factual compilations, the court believes it applies with equal force to the insurance policies at issue given prior precedent. See Cont'l Cas. Co. v. Beardsley, 253 F.2d 702, 705 (2d Cir. 1958) (noting previous cases addressing the copyrighting of insurance and similar forms "have set a stiff standard for proof of infringement"); Miner v. Employers Mut. Liab. Ins. Co., 229 F.2d 35, 35 (D.C. Cir. 1956) (finding no infringement where there was "'no similarity in the arrangement of words of plaintiff's [insurance] policies and the arrangement of words in defendant's policy and that defendant has not appropriated in the exact form or substantially so plaintiff's copyright material'"); Dorsey v. Old Sur. Life Ins. Co., 98 F.2d 872, 874 (10th Cir. 1938) ("Necessarily, where the same contractual provision

-23-

is to be expressed there will be similarity of language.  To constitute infringement in such cases a showing of appropriation in the exact form or substantially so of the copyrighted material should be required.")  Significantly, even if AFLAC successfully shows copying, "[c]opyright infringement occurs only if one copies *protected elements* of a copyrighted work; in other words, the portion of the copyrighted work that is copied must satisfy the constitutional requirement of originality . . . ."  MiTek, 89 F.3d at 1554 (internal quotations and citation omitted).  To this end, the court notes that copyright protection "does not extend to ideas, procedures, processes, or systems, regardless of their originality."  Palmer, 287 F.3d at 1330; see also 17 U.S.C. § 102(b) (2005).  Additionally, "in certain cases, there are so few ways of expressing an idea that the idea and its expression merge.  Under the so-called 'merger doctrine,' these few expressions do not receive copyright protection, since protection of the expressions would thus extend protection to the idea itself."  Palmer, 287 F.3d at 1330.

Preliminarily, the court addresses defendants' argument that "[t]here are numerous examples of language subject to the merger doctrine in the respective contracts."  (Opp'n to Pl.'s Mot. for Prelim. Inj. 23 (emphasis omitted).)  Accordingly, say defendants, such language cannot be subject to protection.  At least with respect to the definitions, limitations, and exclusions AFLAC claims to be original, the court agrees.  Specifically, evidence in the record plainly demonstrates that numerous

competitors use the same language with respect to their definitions, limitations, and exclusions. (See, e.g., Mallari Decl., Ex. 4 (comparing language used in defendants', AFLAC's, and third-party competitors' policies).) For example, "Bone Marrow Transplantation" is defined by AFLAC in its Cancer Policy as follows:[23]

> the harvesting, storage, and subsequent reinfusion of bone marrow from the recipient or a matched donor in which chemotherapy and/or total body radiotherapy to destroy the patient's residual bone marrow is administered. It does not include the harvesting of peripheral blood cells or stem cells and subsequent reinfusion.

(Compl., Ex. A.) Defendants provide a similar, if not identical, definition:

> The harvesting, storage, and subsequent reinfusion of bone marrow from a matched donor to a recipient patient. It includes administration of chemotherapy and/or total body radiotherapy to ablate the patient's residual bone marrow. It does not include the harvesting of peripheral blood cells or stem cells and subsequent reinfusion.

(Compl., Ex. E.) Finally, and most notably however, so do third-party competitor Conseco Health Insurance Company:

> The harvesting, storage and subsequent reinfusion of bone marrow from the recipient or a matched donor in which chemotherapy and/or total body radiotherapy to destroy residual bone marrow is administered. It does not include the harvesting of peripheral blood cells or stem cells and subsequent reinfusion.

(Opp'n to Pl.'s Mot. for Prelim. Inj., Ex. 32-JJ.) As the above example illustrate, not

---

[23]The court relies on this example as AFLAC claims the language for such to be original and in dispute. (See Second Whitaker Decl., Ex. 2-B.)

only is the language used by each company strikingly similar but, if anything, Conseco Health Insurance Company's definition more closely resembles AFLAC's than that of defendants. The same holds true with respect to the majority of other definitions, limitations, and exclusions cited by AFLAC. (See Mallari Decl., Ex. 4.) Such is not the case, however, with AFLAC's benefits sections, as the discussion infra will demonstrate.

i.      Cancer and Accident Policies

AFLAC argues first that defendants' Cancer Policy includes all twenty eight benefits offered by AFLAC while their Accident Policy includes sixteen of seventeen. (Pl.'s Mot. for Prelim. Inj. 11-12.) AFLAC further contends that the changes defendants made are primarily minimal and stylistic in nature. Defendants counter that while they "did choose to compete head to head with AFLAC by offering 'all of AFLAC's benefits' and more at better rates . . . this is legitimate competition." (Opp'n to Pl.'s Mot. for Prelim. Inj. 7.) The court disagrees.

To be sure, the court does not dispute that defendants are entitled to offer "all" of AFLAC's benefits as well as "better rates and payouts and attractive features not available from AFLAC." (Id. 10.) Defendants are not, however, entitled to do so by using language virtually identical to that employed by AFLAC. By way of example, AFLAC and defendants provide the following description of their "Outpatient Blood

and Plasma Benefit" in their Cancer Policies respectively:

> AFLAC will pay $250 (two hundred fifty dollars) for each day a covered person receives blood and/or plasma transfusions for the treatment of Cancer as an outpatient in a Physician's office, clinic, Hospital, or Ambulatory Surgical Center when a charge is incurred. This benefit does not pay for immunoglobulins, immunotherapy, or colony-stimulating factors. No lifetime maximum.

(Compl., Ex. A.)

> A benefit of [$XXX] is payable for each day that an Insured Person receives blood and/or plasma transfusions for the treatment of Cancer as an outpatient in a Physician's office, clinic, Hospital, or Ambulatory Surgical Center. This benefit does not pay for immunoglobulins, immunotherapy, or colony-stimulating factors.

(Compl., Ex. E.)  As the above makes clear, while the term "Insured Person" is substituted for "covered person," defendants appear to have otherwise substantially appropriated, if not outright copied, AFLAC's Cancer Policy benefits language. The same holds true with respect to most, if not all, of the other twenty-seven benefits cited by AFLAC, which the court notes are listed in the same order in both policies.[24]

Defendants respond that, under the merger doctrine, such language cannot be protected by copyright law. Unlike the definitions, limitations, and exclusions discussed <u>supra</u>, however, evidence in the record plainly demonstrates that

---

[24]It appears defendants do offer one benefit for which AFLAC has no counterpart – namely, their Alternative Care Benefit, listed as provision "AA." therein. (<u>See</u> Compl., Ex. E.)

competitors in the supplemental insurance market do not all use the same language to describe their benefits.  For example, Colonial Life & Accident Insurance Company defines their "Blood/Plasma/Platelets/Immunoglobulins Benefit" as follows:

> $200 per day, up to a maximum of $10,0000 per calendar year[.]  We will pay this benefit for each day you incur charges for and receive a transfusion of blood/plasma/platelets/immunoglobulins during the treatment of cancer.  We will not pay this benefit if you are confined to a U.S. Government Hospital.

(Second Whitaker Decl., Ex. 4-FF.)  Notably, defendants themselves provided a different description of their "Outpatient Blood and Plasma Benefit" in their previous and unsuccessful BenefitMart offerings:

> We will pay for blood/plasma processing, blood administration, crossmatching and transfusion fees up to $250 for each day a Covered Person receives blood transfusions for the treatment of Cancer as an outpatient in a Physician's office, clinic, Hospital, or ambulatory surgical center.  This benefit is for the blood/plasma processing, blood administration, crossmatching and transfusion fees.  This benefit does not pay for immunoglobulins, immunotherapy or colony-stimulating factors.  No lifetime maximum.

(AH 351943.)  Although ordered somewhat differently, the benefits language in defendants' Accident Policy also appears to have been substantially appropriated from AFLAC's.  As such, taking into consideration as well (1) the relatively short time in which it took defendants to generate draft policies; (2) Katz Teller's admitted use of AFLAC policies as "samples"; (3) AFLAC's discovery of the verbatim copy of its

Cancer Policy saved as a Katz Teller word processing document; and (4) the actuarial work ordered by defendants prior to formulation of its own policies and based expressly on AFLAC's, the court finds AFLAC has successfully shown that defendants copied original elements of both its Cancer and Accident Policies.

ii.     Hospital and Sickness Policies

AFLAC argues second that, "although not as slavish a copy," defendants Hospital policy includes six of nine benefits offered by AFLAC while their Sickness Policy includes six of six. (Pl.'s Mot. for Prelim. Inj. 12.) In response, defendants make the same arguments they asserted with respect to AFLAC's Cancer and Accident Policies. Although a close call, the court finds that changes defendants made to the benefits language of both policies do not satisfy the more rigid standard articulated for copying by the Eleventh Circuit in BellSouth. For example, in its Hospital Policy, AFLAC offers the following "Heart Attack, Stroke, Coma and Paralysis Benefit":

1.     We will pay $2,000 (two thousand dollars) the first time a covered person is diagnosed as having had any one of the following, whichever occurs first:

a.     Heart Attack,
b.     Stroke,
c.     Coma (for a period of at least seven days), or
d.     Paralysis (for a period of at least 30 days).

We will pay this benefit no more than once per covered person. Lifetime maximum of $2,000 (two thousand dollars) per covered person.

2. We will pay $1,000 (one thousand dollars) when a covered person is later diagnosed as having had any one of the following:

a. Heart Attack,
b. Stroke,
c. Coma (for a period of at least seven days), or
d. Paralysis (for a period of at least 30 days).

For Benefit E2 to be payable, the diagnosis must occur more than 180 days after the benefit becomes payable under item E1. This benefit (Item E2) will again become payable for Heart Attack, Stroke, Coma or Paralysis occurring more than 180 days after it was last paid. No lifetime maximum.

Important: The Heart Attack, Stroke, Coma or Paralysis must occur while coverage is in force. This benefit is subject to Part 2A, Limitations and Exclusions.

(Compl., Ex. C.) By contrast, defendants articulate their "Coma, Stroke, or Paralysis Benefit" as follows: "A benefit of $5,000 is payable for each Insured Person when he or she is first diagnosed by a Physician as having a Coma, Stroke or Paralysis. This benefit is payable only once for each insured Person." (Compl., Ex. G.) As the above makes clear, both parties offer the same benefit (i.e., money following the occurrence of stroke, coma, or paralysis) but use different language in doing so. The same holds true with the majority of benefits offered by defendants with respect to their Hospital and Sickness Policies. As such, the court finds AFLAC has not demonstrated that defendants committed the legally required level of copying of original elements of its Hospital and Sickness Policies so as to constitute copyright infringement.

2.    Substantial Threat of Irreparable Injury

AFLAC argues that because it "has shown a likelihood of success on its copyright infringement claims" with respect to its Cancer and Accident Policies[25] it is "entitle[d] . . . to a presumption of irreparable harm."  (Pl.'s Mot. for Prelim. Inj. 35.) In response, defendants counter "[w]hile some district courts in the Eleventh Circuit have suggested that a partial presumption **may** exist under certain circumstances, the Eleventh Circuit has not adopted such a presumption (automatic or discretionary) as a substitute for a moving party's burden of providing substantial evidence of irreparable harm in a copyright case."  (Opp'n to Pl.'s Mot. for Prelim. Inj. 30.)  The court disagrees.

In the Northern District of Georgia, it has plainly been held that, "[o]nce a copyright holder has made out a *prima facie* case of copyright infringement, irreparable injury is presumed."  Georgia Television Co. v. TV News Clips of Atlanta, Inc., 718 F. Supp. 939, 948 (N.D. Ga. 1989) (Camp, J.); see also Foxworthy v. Custom Tees, Inc., 879 F. Supp. 1200, 1219 (N.D. Ga. 1995) (Freeman, J.); Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc., 642 F. Supp. 1031, 1040 (N.D. Ga. 1986)

---

[25]Because AFLAC has failed to demonstrate a substantial likelihood of success on the merits with respect to its Hospital and Sickness policies, the remainder of the court's discussion focuses on the company's Cancer and Accident Policies only.  See Jefferson County, 720 F.2d at 1519.

(Tidwell, J.).   Defendants respond by citing the Eleventh Circuit's statement that "plaintiff's success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm" in <u>Snook v. Trust Co. of Georgia Bank of Savannah, N.A.</u>, 909 F.2d 480, 486 (11th Cir. 1990) (affirming district court's denial of a preliminary injunction) (internal quotations and citation omitted).   Plaintiffs in <u>Snook</u>, however, were alleging violations of the Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations (RICO) Act, not copyright infringement.   By contrast, in <u>Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.</u>, 600 F.2d 1184, 1188 (5th Cir. 1979),[26] the court expressly recognized that, "If the record demonstrated a substantial likelihood that the [plaintiffs] could have a valid copyright infringement claim against the defendants the district court was well within its discretion in granting the preliminary injunction" with no discussion of irreparable harm.[27]   Additionally, where the question has been considered in other

---

[26]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[27]Although the Eleventh Circuit has never expressly affirmed the panel's finding in <u>Dallas Cowboys</u>, it has also never held the law to be otherwise.  Indeed, insofar as this court can determine, the question has been presented tangentially but once before the Eleventh Circuit in <u>Suntrust</u>.  Specifically, after restating the district court's finding that "irreparable injury to Suntrust[] could be presumed following a showing of copyright infringement," the Eleventh Circuit held that no such presumption exists "when the alleged infringer has a bona fide fair-use defense."  <u>Suntrust</u>, 268 F.3d at 1276.  The Eleventh Circuit made no finding, however, as to whether irreparable injury could be

circuits, the presumption has overwhelmingly been recognized. <u>See, e.g.</u>, <u>ABKCO Music, Inc. v. Stellar Records, Inc.</u>, 96 F.3d 60, 64 (2d Cir. 1996) ("[G]enerally when a copyright plaintiff makes out a *prima facie* showing of infringement, irreparable harm may be presumed."); <u>Country Kids 'N City Slicks, Inc. v. Sheen</u>, 77 F.3d 1280, 1288-89 (10th Cir. 1996) ("[W]e join the overwhelming majority of our sister circuits and recognize a presumption of injury at the preliminary injunction stage once a copyright infringement plaintiff has demonstrated a likelihood of success on the merits."); <u>Triad Sys. Corp. v. Se. Express Co.</u>, 64 F.3d 1330, 1335 (9th Cir. 1995) ("In a copyright infringement action . . . the rules are somewhat different.  A showing of a reasonable likelihood of success on the merits raises a *presumption* of irreparable harm."); <u>Serv. & Training, Inc. v. Data Gen. Corp.</u>, 963 F.2d 680, 690 (4th Cir. 1992) ("Once [defendant] established a *prima facie* claim of copyright infringement, the district court was entitled to presume that [defendant] could show . . . irreparable harm."); <u>Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 611 (1st Cir. 1988) ("[I]rreparable harm is usually presumed if likelihood of success on the copyright claim has been shown.  There is, therefore, no need actually to prove irreparable harm when seeking an injunction against copyright infringement."); <u>Forry, Inc. v. Neundorfer, Inc.</u>, 837 F.2d 259, 267 (6th Cir. 1988) ("[A] plaintiff in a

_____

presumed when a fair-use defense was not at issue.

copyright infringement action establishes a rebuttable presumption of irreparable harm by showing that its valid copyright has been infringed."); Nat'l Football League v. McBee & Bruno's, Inc., 792 F.2d 726, 729 (8th Cir. 1986) ("Copyright law has long held that irreparable injury is presumed when the exclusive rights of the holder are infringed."); Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1254 (3d Cir. 1983) ("A copyright plaintiff who makes out a prima facie case of infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm."); Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp., 672 F.2d 607, 620 (7th Cir. 1982) ("Irreparable injury may normally be presumed from a showing of copyright infringement."), superseded by statute on other grounds, Fed. R. Civ. P. 52(a); see also 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06[A] at 14-124 to -125 (2005) ("It is the prevailing view that a showing of a *prima facie* case of copyright infringement, or reasonable likelihood of success on the merits, raises a presumption of irreparable harm.") (internal quotations and citations omitted). But see Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc., 807 F.2d 1256, 1261 (5th Cir. 1987) ("Th[e irreparable injury] rule . . . is not established in this circuit. On the contrary, we have made it clear . . . that preliminary injunctions will be denied based on a failure to prove separately each of the four elements of the four prong test for obtaining the injunction."). Because AFLAC has demonstrated a

substantial likelihood of success on the merits with respect to its Cancer and Accident policies, in light of the precedent cited <u>supra</u>, the court finds irreparable injury may be presumed.

In response, defendants argue first that because "any harm to AFLAC can be compensated by money damages under 17 U.S.C. 504(b), it is not entitled to a preliminary injunction." (Opp'n to Pl.'s Mot. for Prelim. Inj. 33.) Again, the court disagrees. "When the plaintiff demonstrates a substantial likelihood of success at trial by establishing a *prima facie* case of copyright infringement . . . a significant showing of actual damages is not required because irreparable injury is presumed." <u>Georgia Television Co.</u>, 718 F. Supp. at 949; <u>accord</u> <u>Country Kids</u>, 77 F.3d at 1288 (recognizing presumption of injury, in part, "[b]ecause the financial impact of copyright infringement is hard to measure and often involves intangible qualities"). Those cases cited by defendants are not to the contrary. First, in <u>Roberts v. Atlantic Recording Corp.</u>, 892 F. Supp. 83, 87-88 (S.D.N.Y. 1995) the court required plaintiffs to demonstrate irreparable harm, which it defined as "an injury for which a monetary award cannot be adequate compensation," only <u>after</u> finding the presumption had "disappeared" due to plaintiffs' unreasonable delay in prosecuting their infringement claim. Normally in the Second Circuit, however, "when a copyright is infringed, irreparable harm is presumed; this is because the confusion created in the

marketplace will damage the copyright holder in incalculable and incurable ways." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 124 (2d Cir. 1994). Similarly, in Liberty American Insurance Group, Inc. v. Westpoint Underwriters, L.L.C., 199 F. Supp. 2d 1271, 1291 (M.D. Fla. 2001), the court adopted a magistrate judge's finding that plaintiffs had failed to show irreparable harm in light of testimony that money damages could redress its injuries only after adopting the magistrate judge's finding that plaintiffs had failed to establish a likelihood of success on the merits of its copyright infringement claim. Indeed, in her Report and Recommendation, the magistrate judge expressly recognized plaintiff's contention that "irreparable injury is presumed with copyright infringement" to be "well established." Id. at 1304 (emphasis added). The court thus finds no basis for defendants' argument that because AFLAC can be compensated by money damages, it is not entitled to a preliminary injunction where the presumption of irreparable harm has not "disappeared."

Defendants argue second that "even in the circuits where a presumption of irreparable injury exists, '[i]t is well established that undue delay in seeking a preliminary injunction may rebut this presumption.'" (Opp'n to Pl.'s Mot. for Prelim. Inj. 33 (citation omitted).) This is because "'[a]n unreasonable delay suggests that the [moving party] may have acquiesced in the infringing activity, or that any harm

suffered by the [moving party] is not so severe as to be irreparable." (Id. (citation omitted).) According to defendants, "AFLAC waited ten months after learning of Defendants' alleged infringement to file this lawsuit"[28] and "another five months after filing suit to seek a preliminary injunction" without offering any explanation for the delay or why a preliminary injunction is "essential" at this time. (Id. 34.) Defendants further maintain they were "prejudiced" thereby, arguing "[h]ad AFLAC simply notified Defendants of its concerns and provided Defendants with sufficient information to evaluate AFLAC's claim of originality and infringement of protectable expression . . . Defendants could have made any arguably appropriate changes." (Opp'n to Pl.'s Mot. for Prelim. Inj. 34 n.14.) Because, however, "AFLAC said nothing during the intervening months, Defendants expended significant sums in obtaining state approvals and marketing Defendants' products." (Id.) In response, AFLAC argues its delay was not unreasonable, noting "[a]lthough Defendants announced at a trade show in August 2004 that they intended to enter the supplemental insurance

---

[28]According to defendants, VoluntaryMart was first introduced at a "major industry conference" in August 2004. (Opp'n to Pl.'s Mot. for Prelim. Inj. 11.) At this conference, defendants distributed a "Dare to Compare Rates/Benefits" document which expressly compared its rates and benefits with those of AFLAC. Defendants maintain that because AFLAC has admitted to attending this show, receiving defendants' "Dare to Compare Rates/Benefits" document, and obtaining copies of defendants' policies "shortly thereafter," AFLAC "had everything it needed to file an infringement suit no later than the early fall of 2004." (Id. 11-12.)

market, they did not begin offering policies to the public until November 29, 2004."

(Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 23.) Accordingly, "[a]ctionable

infringement . . . could not have begun earlier than that." (Id.) Further, although

AFLAC indicated it would seek a preliminary injunction when suit was first filed in

June 2005, the company "encountered substantial roadblocks and had to file five

motions to compel."[29] (Id.) Finally, argues AFLAC, defendants' claim of prejudice is

without merit. (Id. 24-25.) The court agrees.

In the Northern District of Georgia, delays as long as two years have been

found not to rebut the presumption of irreparable harm. See Georgia Television Co.,

718 F. Supp. at 949. Here, even relying solely on defendants' timeline of events,

AFLAC's alleged delay falls well short of this benchmark. Further, defendants not

only had notice AFLAC would seek injunctive relief as early as June 2005 (see Compl.

14), but, in the court's view, substantially contributed to delays in AFLAC's attempt

to do so, as evidenced by several motions to compel AFLAC filed with this court. See

id. at 949 (considering plaintiff's efforts to obtain "litigable proof" in determining

presumption of irreparable harm had not been rebutted despite plaintiff's delay in

---

[29]Although one of these motions has since been withdrawn, at least one other has
been resolved in AFLAC's favor by express Order of this court. According to AFLAC, –
and, increasingly, in the court's view as well – the remaining three were resolved only
after defendants' "belated cooperation." (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 23
(emphasis added).)

bringing litigation).  Finally, while evidence of prejudice might otherwise bolster

defendants' defense, see id., no such showing has been made here.  First, defendants

had notice of AFLAC's concerns by June 2005.  Second, as argued by AFLAC, to the

extent defendants copied AFLAC's Cancer and Accident Policies as a means of

cheaply and efficiently entering the supplemental insurance market, the court is

skeptical of defendants' claims that "arguably appropriate changes" would have

been made upon receipt of notification from AFLAC.  Third, that defendants obtained

approval from several states relatively quickly,[30] are currently selling their policies

in eight states only, and fail to define what it means by "significant sums" in light of

its  self-proclaimed Fortune 500 status (see Opp'n to Pl.'s Mot. for Prelim. Inj. 32)

similarly mitigates against a finding of prejudice.  Accordingly, the court finds

unreasonable delay is not an appropriate defense in this action.

Defendants argue finally that because AFLAC "has failed to show that it has

---

[30]At the December 22 hearing, AFLAC submitted a chart which evidenced that defendants filed their policies in Arkansas on or about June 7, 2004 and received approval on or about July 26 and 27, 2004; in Colorado on or about June 10, 2004 and received approval on or about July 12, 2004; in Florida on or about May 5, 2004 and received approval on or about July 9 and September 3 and 4, 2004; in Ohio on or about March 5 and April 9, 2004 and received approval on or about September 10 through 15, 2004; in Texas on or about July 13, 2004 and received approval on or about July 14 and 15, 2004; in Utah on or about December 3, 2004 and received approval December 10 through 27, 2004; and in Wisconsin on or about May 28, 2004 and received approval on or about June 1 and July 16 through 27, 2004.  Defendants also filed their policies in Idaho, a "file and use" state, on or about May 17, 2004.

suffered 'copyright harm,'" it is not entitled to injunctive relief. (Opp'n to Pl.'s Mot. for Prelim. Inj. 35.) Specifically, defendants argue that because "[t]he only harm cognizable under the Copyright Act is economic, market substitution harm" and "purchasers of insurance make decisions not because of any memorable turn of phrase or moving paragraph in a contract, but rather in reliance on information provided by independent insurance agents," any harm suffered by AFLAC is "not the type of harm that is cognizable under the Copyright Act." (Id. 35-36.) The court disagrees. First, although defendants cite both Suntrust, 268 F.3d at 1280-81 and Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171, 1177-78 (11th Cir. 1980) for the proposition that the only harm cognizable under the Copyright Act is that of market substitution, the court finds these cases to be inapposite. Specifically, in both Suntrust and Triangle Publ'ns, Inc., market substitution is addressed by the Eleventh Circuit as one of four elements to be analyzed with respect to the affirmative defense of fair use – not copyright infringement. No such defense, however, has been asserted in the present matter. Second, the court finds defendants' argument that language does not matter in the insurance context misleading. Not only are purchasers of defendants' policies informed as to policy language prior to purchase (see, e.g., Bartlett Dep. 108:2-114:15, Dec. 5, 2005 (noting "detailed" benefit language in defendants' Cancer and Accident

Policy marketing brochures)) but, once approved, purchasers receive a copy of the policy itself and are given thirty days in which to review and return the policy if unsatisfied.  (See, e.g., Compl., Exs. E-H (noting that if a policyowner chooses to return the policy, "[b]oth the [p]olicyowner and [defendants] shall then be in the same position as if no policy had been issued").)  Purchasers' decisions whether to renew a policy are also arguably influenced by the language used.  Accordingly, the court finds defendants' argument that because AFLAC has failed to show it has suffered copyright harm, it is not entitled to injunctive relief similarly without merit.

In light of the forgeoing, the court finds that with respect to defendants' Cancer and Accident Policies, AFLAC has successfully established the second element of its infringement claim and shown a substantial threat of irreparable injury.

3.      Balancing of the Equities

Defendants argue that "the requested injunction would have an immediate material–and, longer term, a potentially devastating–effect on Defendants and their business."  (Opp'n to Pl.'s Mot. for Prelim. Inj. 36-37.)  Specifically, defendants are concerned that if an injunction were granted,  "[m]any if not all" of their insurance agents "would "choose not to sell any Assurant Health product at all"; it would be "all but impossible for [defendants] to attract new agents to replace those who were frightened away"; and defendants would be "force[d] . . . out of the market for many

months." (Id. 37.)  While the court is cognizant of the harm an injunction <u>might</u> have on defendants' business, "[c]opyright law . . . dictates that such injury merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement of [AFLAC's] asserted legal rights."  <u>See</u> <u>Georgia Television Co.</u>, 718 F. Supp. at 949.  Indeed, where a plaintiff has made a <u>prima facie</u> showing of copyright infringement, "a preliminary injunction should not be denied merely because of the devastating effect or potential destruction of the defendant[]s['] business."  <u>Id.</u>  To this end, the court notes that "[f]ailure to issue the injunction would harm plaintiff by, at a minimum, forcing [it] to compete with an infringer . . . ."  <u>Foxworthy</u>, 879 F. Supp. at 1219.  "Issuing the injunction, however, will harm defendants only to the extent that they cannot sell illegally infringing [policies]."  <u>Id.</u>  Accordingly, the court finds that with respect to defendants' Cancer and Accident Policies, AFLAC has successfully established the third element of its infringement claim and shown that the balancing of equities tips in its favor.

        4.      Public Interest

Defendants argue finally that "[e]njoing Defendants will not only insulate AFLAC from the competition it fears; it will impact those consumers who already struggle to afford insurance" because "VoluntaryMart Products are 15-50% lower than AFLAC's for approximately two-thirds of the potential purchasers of these

products." (Opp'n to Pl.'s Mot. for Prelim. Inj. 38.)  Indeed, theorize defendants, "the harm to the public may worsen" as "[f]ree from price competition by [defendants], AFLAC will likely maintain its already high insurance premiums, if not raise them, or further reduce its benefits" causing some consumers "to forego insurance altogether, with predictable impacts on future bankruptcies." (Id.)  Notwithstanding defendants' supposed parade of horribles,[31] "[o]nce the plaintiff in a copyright infringement action has established a likelihood of success on the merits, there is seldom any question of whether the entry of an injunction will serve the public interest." Georgia Television Co., 718 F. Supp. at 950; see also Foxworthy, 879 F. Supp. at 1219 ("The public's interest is served any time the law is upheld and enforced.").  Accordingly, the court finds that with respect to defendants' Cancer and Accident Policies, AFLAC has successfully established the fourth element of its infringement claim and shown that an injunction will not disserve the public interest.

## IV.    Summary

---

[31]For its part, AFLAC contends defendants' argument that the company will raise prices if a preliminary injunction is granted "is totally baseless," noting prices in the market are regulated.  (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 29.)  Additionally, given defendants have generated relatively few sales to date (see Opp'n to Pl.'s Mot. for Prelim. Inj. 32 (noting through October 2005, defendants' gross sales for all four policies totaled less than $225,000)), the court is fairly confident that an injunction will leave the vast majority of consumers in no worse a position than before defendants began selling their infringing policies in November 2004.

For the foregoing reasons, AFLAC's Motion for Preliminary Injunction [Doc. No. 68] is GRANTED IN PART and DENIED IN PART as detailed herein. AFLAC's Notice of Objections [Doc. No. 119] is DENIED. Defendants are hereby ENJOINED from selling its infringing Cancer and Accident Policies during the pendency of this lawsuit. Pursuant to Federal Rule of Civil Procedure 65(c), the court will require plaintiffs to post a security bond. Rule 65(c) requires the posting of security in such sum as the court deems proper for the payment of costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. The parties are hereby DIRECTED to submit briefs on this issue within ten (10) days of the date of this Order.

Additionally, it has come to the court's attention that its Order of August 2, 2005 [Doc. No. 25], which gave instructions to the parties as to the steps required to be taken before filing a document under seal has been observed only in the breach. While the court will address this matter with the parties in more detail at a later time, the parties are hereby ADVISED that future filings which do not comply with the August 2, 2005 Order may be stricken from the docket of this proceeding.

IT IS SO ORDERED, this 11th day of January, 2006.


s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE